## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

In Re: Granulated Sugar                    MDL No. 24-3110 (JWB/DTS)
Antitrust Litigation

**MEMORANDUM OPINION AND
ORDER ON
MOTIONS TO DISMISS**

---

This case asks whether the nation's largest sugar producers crossed the line from observing market forces to collectively and improperly manipulating them. Dozens of suits across the country alleged that refiners of granulated sugar shared competitively sensitive information to keep prices artificially high. The Judicial Panel on Multidistrict Litigation transferred those actions to the District of Minnesota for coordinated pretrial proceedings.

Plaintiffs filed a Master Consolidated Complaint on February 27, 2025, followed by Short-Form Complaints for each subclass of purchasers. Defendants—nine entities ranging from well-known producers to an information broker—jointly moved to dismiss. Three Defendants also filed separate motions. Additionally, the United States submitted a Statement of Interest in the subject matter of the case under 28 U.S.C. § 517. This Court heard argument on September 29, 2025.

The motions test the sufficiency of the pleadings under *Bell Atlantic Corp. v. Twombly* and *Ashcroft v. Iqbal* (collectively, the "*Twombly–Iqbal* standard"): whether Plaintiffs have alleged facts that plausibly support an inference of concerted action under § 1 of the Sherman Act and parallel state-law claims. In addition to *Twombly–Iqbal*, this

Court also considers the pleadings in light of judicially noticeable market context, including *United States v. United States Sugar Corp.*, 73 F.4th 197 (3d Cir. 2023), but only for background and not for the truth of any disputed facts or findings.

Applying these standards, some claims survive and others do not. The allegations are sufficient to proceed against the ASR/Domino and United Defendants, but they do not plausibly connect Michigan Sugar, Louis Dreyfus, Imperial, or U.S. Sugar Savannah to any agreement to fix prices or unlawfully exchange information. The motions to dismiss are therefore granted in part and denied in part, with leave to amend.

## BACKGROUND

### I.    The Parties

Plaintiffs here fall into three groups: Direct Purchasers, who bought sugar directly from a Producer Defendant; Commercial Indirect Purchasers, such as restaurants and bakeries that bought through distributors; and Consumer Indirect Purchasers, who bought sugar retail for personal use. All Plaintiffs bring this action on behalf of themselves and as a class action under Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3).

Each Plaintiff group alleges a separate defined Class. The Consumer Indirect Purchaser Plaintiffs also seek to define three subclasses of their Nationwide Class.

The Defendants are nine in number:

- ASR Group International, Inc. ("ASR Group");
- American Sugar Refining, Inc. ("ASR");
- Domino Foods, Inc. ("Domino");
- Imperial Sugar Co. n/k/a United States Sugar Savannah Refinery, LLC ("Imperial Sugar") ("U.S. Sugar Savannah");
- Louis Dreyfus Company LLC ("Louis Dreyfus");

- Michigan Sugar Company ("Michigan Sugar");
- United Sugar Producers & Refiners f/k/a United Sugars Corporation ("United");
- Commodity Information, Inc. ("Commodity"); and
- Richard Wistisen.

ASR Group, ASR, and Domino are collectively referred to as "ASR/Domino." ASR is a producer and seller of granulated sugar, and ASR Group is a sugar refiner and marketer. ASR Group owns Domino and Domino serves as ASR Group and ASR's marketing and sales subsidiary for granulated sugar.

Plaintiffs allege Imperial Sugar produces granulated sugar in the United States and markets and sells granulated sugar products. Louis Dreyfus acquired Imperial Sugar in 2012 and later sold its assets to U.S. Sugar Savannah in 2022. Both Louis Dreyfus and U.S. Sugar Savannah are named Defendants in the Master Consolidated Complaint ("MCC"). The claims asserted against Louis Dreyfus are based on the alleged actions of Imperial Sugar.

Richard Wistisen is the principal of Commodity, and Plaintiffs allege they are alter egos. Commodity and Wistisen are together referred to as the "Commodity Defendants."

ASR Group, ASR, Domino, U.S. Sugar Savannah, Louis Dreyfus, Michigan Sugar, and United are referred to as the "Producer Defendants." The Producer Defendants, either directly or through marketing affiliates, market and sell granulated sugar to customers, including food and beverage manufacturers, retailers, and food service companies. They also sell granulated sugar to distributors who resell or further refine it into various other types of sugar products. During the relevant period, the Producer Defendants together controlled 70 to 75 percent of the market for granulated

sugar in the United States.

## II.    Relevant Prior Litigation and Regulation

In 2019, United States Sugar—one of United's member owners—entered an asset-purchase agreement for its subsidiary, U.S. Sugar Savannah, to acquire Imperial Sugar. Under that structure, United would market and sell all sugar produced by Imperial. In 2022, United acquired Imperial from Louis Dreyfus. The acquisition prompted a Department of Justice ("DOJ") challenge that frames part of the market context here.

The DOJ sued to block the merger, arguing that combining U.S. Sugar and Imperial would concentrate control of refined sugar sales in the Southeast and raise prices for businesses and consumers. The district court rejected Defendants' argument that sugar sales are geographically limited to single states or narrow regions, finding instead that refined sugar frequently crosses state lines and that distributors routinely source sugar from multiple producers across broader markets. The Third Circuit affirmed, underscoring the commercial reality that refined sugar markets extend beyond narrow state boundaries and that distributor purchasing behavior competes across regions. *United States Sugar Corp.*, 73 F.4th at 201–02. That DOJ dispute underscored the fluid, nationwide movement of refined sugar and the role of independent distributors whose competition affects price.

Granulated sugar is a commodity product with little or no differentiation based on the producer. Thus, competition for granulated sugar products is based on price. (Doc. No. 332, MCC ¶ 56.) The United States Department of Agriculture ("USDA") regulates the sale of raw and refined sugar in the United States and manages the supply of sugar to

ensure that prices remain reasonable. (*See id.* ¶¶ 72, 173, 211–18.) The USDA provides

"price support loans, marketing allotments, and import quotas to maintain baseline sugar

prices in the United States," but it does not set or approve domestic prices. (*Id.* ¶ 212.)

### III.    Plaintiffs' Allegations and Claims

Plaintiffs allege that during the Class period (from January 1, 2019 to the present),

the Commodity Defendants provided the Producer Defendants with real-time access to

competitor data that was current, forward-looking, and non-anonymized. The Producer

Defendants allegedly agreed to use Commodity's clearinghouse to obtain and share that

information in order to fix and maintain granulate sugar prices. (MCC ¶¶ 1–4.)

Plaintiffs further allege that the arrangement was "exclusive and secretive." (*Id.*

¶ 67.) Commodity, they contend, had no public profile, did not market its services openly,

and published no anonymized research drawn from the competitively sensitive

information it received from the Producer Defendants. (*Id.* ¶¶ 67–68, 70.)

Plaintiffs contend the Producer Defendants shared information—through internal

communications with Wistisen—about their profits, prices, costs, production levels, and

"sold positions" (the portion of a seller's supply no longer available for purchase). (*Id.*

¶ 5.) Plaintiffs allege these are key metrics and highly competitively sensitive data in the

granulated sugar market that competitors ordinarily would not exchange. (*Id.*) They also

allege that this information was not available to the public or to other sugar suppliers. (*Id.*

¶ 6.) This alleged conduct culminated in what Plaintiffs call a "give to get" scheme, in

which the Commodity Defendants and the Producer Defendants agreed to share

competitively sensitive information so long as others in the group did the same. (*Id.*) As

an example, Plaintiffs allege that the Producer Defendants shared "sold positions" information so that, "[b]y knowing when a rival was nearing full capacity," they could confidently raise prices without fear of being undercut by their competitors. (*Id.* ¶ 66.)

Plaintiffs also cite instances in which Producer Defendants used information from Wistisen when making pricing decisions and sending messages internally about competitor pricing, and they also used Wistisen to signal pricing intentions to competitors indirectly. (MCC ¶¶ 118–20, 126–27.) They allege, for example, that the Producer Defendants told Wistisen they supported using "Number 16" spot prices—based on publicly traded futures contracts for raw cane sugar in the United States—as a formula for setting their prices and as a signal for competitors to follow. (*Id.* ¶¶ 131–33.) They further allege that, after Wistisen relayed United's plan to raise prices in May 2021, Michigan Sugar increased its prices in June 2021 and ASR/Domino followed with increases in June, August, and October 2021. (*Id.* ¶¶ 153–56 (stating that Wistisen told ASR/Domino, based on a talk he had with United, to "expect big action over the next month … and … expect to raise prices").)

Plaintiffs contend that these communications, taken together, show a price-fixing conspiracy in violation of the antitrust laws. They allege that Defendants used Commodity as an intermediary to exchange competitively sensitive information to stabilize or control industry pricing, which drove granulated-sugar prices to all-time highs during the Class Period and eliminated meaningful competition. (*Id.* ¶¶ 12, 63, 66, 118, 166, 195.) As stated in the MCC, nominal retail prices of granulated sugar rose 69 percent from January 2019 through October 2024, a change Plaintiffs attribute to collusion rather

than to market forces. (*Id.* ¶¶ 136–37, 140.) The Consumer Indirect Purchaser Plaintiffs specifically allege that the average retail price for a pound of granulated sugar in U.S. cities increased from $0.595 in January 2019 to $1.011 in January 2025—a 70 percent increase. (Consumer Indirect Purchaser Plaintiffs' Short-Form Complaint ¶ 58.).

Various Plaintiffs began filing suit in 2024. To centralize the related actions, the United States Judicial Panel on Multidistrict Litigation transferred the matters to the District of Minnesota, where they have been consolidated before the undersigned. In this MDL, all Plaintiffs allege that Defendants violated §§ 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3, by engaging in price fixing and an unlawful exchange of competitively sensitive information. The Commercial Indirect Purchaser Plaintiffs and the Consumer Indirect Purchaser Plaintiffs also assert claims under various state antitrust, consumer protection, and unjust enrichment laws.

## DISCUSSION

### I.    Standard of Review

To survive a motion to dismiss, a complaint must contain enough factual content to state a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plausibility requires more than mere labels, conclusory allegations, or a formulaic recitation of the elements; the plaintiff must allege facts that raise the right to relief above the speculative level. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Even well-pled facts do not suffice if they suggest only a possibility of misconduct. *Iqbal*, 556 U.S. at 679.

In considering a motion to dismiss, well-pled allegations are accepted as true and

reasonable inferences are drawn in the plaintiff's favor. *Schriener v. Quicken Loans, Inc.*, 774 F.3d 442, 444 (8th Cir. 2014). But courts are not required to supply missing allegations or accept legal conclusions dressed up as facts. *See Gregory v. Dillard's Inc.*, 565 F.3d 464, 473 (8th Cir. 2009); *Wiles v. Capitol Indem. Corp.*, 280 F.3d 868, 870 (8th Cir. 2002). Courts may consider documents that are not attached to the pleading if their contents are alleged in the complaint and their authenticity is not questioned. *See Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 831 (8th Cir. 2003).

Under Federal Rule of Evidence 201(b), a court may take judicial notice of public documents—including prior judicial opinions such as the district court and Third Circuit opinions in the *United States Sugar Corporation* litigation—to understand context and assess plausibility. *See Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 543 n.4 (8th Cir. 2015) (citing *Kushner*, 317 F.3d at 832). Such judicial notice serves only to recognize undisputed adjudicative facts, not to establish the truth of disputed findings. *Id.*; *see also McIvor v. Credit Control Servs., Inc.*, 773 F.3d 909, 914 (8th Cir. 2014).

Federal courts are properly vigilant in screening meritless antitrust claims at the pleading stage. Discovery in such cases is unusually costly, difficult to police, and often coerces settlement of weak claims. *See Insulate SB*, 797 F.3d at 543 (quotations omitted); *cf. In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 625–26 (7th Cir. 2010) ("When a district court by misapplying the *Twombly* standard allows a complex case of extremely dubious merit to proceed, it bids fair to immerse the parties in the discovery swamp . . . and by doing so create irrevocable as well as unjustifiable harm to the defendant.").

## II.    The Sherman Act

Plaintiffs allege Defendants have violated the Sherman Act through price fixing and unlawful information exchange. (MCC ¶¶ 230–36 (Count I – Price Fixing); ¶¶ 237–45 (Count II – Unlawful Information Exchange).)

Section 1 of the Sherman Act declares illegal "[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations . . ." 15 U.S.C. § 1. To establish a claim under § 1, a plaintiff must show (1) a contract, combination, or conspiracy; (2) that the agreement unreasonably restrained trade, either *per se* or under the rule of reason analysis; and (3) an effect on interstate commerce. *Insignia Sys., Inc. v. News Am. Mktg. In-Store, Inc.*, 661 F. Supp. 2d 1039, 1062 (D. Minn. 2009) (quotations omitted). Because § 1 "does not prohibit all unreasonable restraints of trade . . . but only restraints effected by a contract, combination, or conspiracy," the crucial inquiry is whether the challenged conduct stems from independent decision-making or from a tacit or express agreement. *Twombly*, 550 U.S. at 553 (quotations omitted).

A horizontal price-fixing agreement—as alleged in Count I—meaning an agreement among competitors operating at the same level of distribution, rather than between supplier and customer—is considered so inherently anticompetitive that it is *per se* illegal "without inquiry into the harm it has actually caused." *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984). Thus, to plead such a claim, antitrust plaintiffs must allege concerted action among competitors.

"[T]o satisfy the concerted action requirement, the plaintiff must demonstrate that

the defendants shared a unity of purpose or a common design and understanding, or a meeting of the minds." *Insulate SB*, 797 F.3d at 543 (quotations omitted). Direct evidence of an agreement—when detailed and explicit—can satisfy the pleading burden. *See Twombly*, 550 U.S. at 564. But direct evidence is rarely available at the pleading stage. *ES Dev., Inc. v. RWM Enters., Inc.*, 939 F.2d 547, 553–54 (8th Cir. 1991) ("[T]he typical conspiracy is rarely evidenced by explicit agreements, but must almost always be proved by inferences that may be drawn from the behavior of the alleged conspirators.").

Alternatively, antitrust plaintiffs may rely on circumstantial evidence. To do so, the complaint must plausibly allege parallel conduct among competitors that "would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." *See Twombly*, 550 U.S. at 556 n.4 (quotation omitted).

Along with parallel conduct, antitrust plaintiffs must also plead "plus factors"—circumstances suggesting that the parallelism was the product of agreement rather than coincidence. *See, e.g.*, *Blomkest Fertilizer, Inc. v. Potash Corp. of Sask.*, 203 F.3d 1028, 1033 (8th Cir. 2000) ("An agreement is properly inferred from conscious parallelism only when certain 'plus factors' exist."); *In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1069 (8th Cir. 2017) ("An allegation of parallel conduct . . . gets the complaint close to stating a claim," and "[w]ith further factual enhancement, plaintiffs can nudge their claims across the line from conceivable to plausible.") (quotations omitted). Plus factors may include a shared motive to conspire, action against self-interest, market concentration, or extensive inter-firm communication in connection with parallel conduct.

*See, e.g.*, *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194–95 (9th Cir. 2015).

### A.    Price-Fixing Claim

#### 1.    Direct Evidence of an Agreement

To plead a price-fixing conspiracy, a plaintiff must allege either direct evidence of an agreement or circumstantial evidence showing concerted action (including parallel conduct) and at least one "plus factor" from which agreement may be plausibly inferred. *See Insulate SB*, 797 F.3d at 544–45. Defendants argue that Plaintiffs have not plausibly alleged such an agreement. Plaintiffs respond that they have offered direct evidence.

What Plaintiffs are describing as direct evidence is not. Direct evidence is "explicit and requires no inferences." *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 225 (3d Cir. 2011). Plaintiffs cite 2020–2021 statements from Wistisen and executives at ASR/Domino and United concerning competitor prices, expected price increases, and pricing formulas. None, however, contains an express agreement to fix prices or to move prices in concert. The same is true of communications between broker Gerald Kramer and managers at Louis Dreyfus and Imperial.

These allegations demonstrate that competitors shared pricing information—an act that can be probative and a warning signal in antitrust analysis—but the statements are not direct evidence of agreement. While some of the communications convey forward-looking, firm-specific content, none of them contain an express promise or acknowledgement to set joint pricing. *Cf. In re Cattle Antitrust Litig.*, Civ. No. 19-1222 (JRT/HB), Civ. No. 19-1129 (JRT/HB), Civ. No. 20-1319 (JRT/HB), Civ. No. 20-1414

(JRT/HB), 2021 WL 7757881, at *3–4 (D. Minn. Sept. 14, 2021) (finding direct evidence where witnesses reported that each defendant expressly agreed to reduce purchase volumes to depress cattle prices). At most, the allegations here point to circumstantial evidence.

### 2.    Circumstantial Evidence of Parallel Conduct

To plead an agreement through circumstantial evidence, Plaintiffs must allege sufficient facts from which an unlawful agreement can be plausibly inferred. *See Twombly*, 550 U.S. at 556–57. This requires allegations of parallel business conduct among competitors, combined with "plus factors" that put the parallel conduct "in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.* at 557. This plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

As pled, Plaintiffs' allegations of parallel conduct among the Producer Defendants—except for United and ASR/Domino—are too generalized and conclusory to support a plausible inference of agreement. Simultaneous and identical price movement are not required, but the alleged movements must be reasonably close in time and value. *In re Generic Pharms. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 441 (E.D. Pa. 2018); *see also Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 516–17 (8th Cir. 2018) (finding plaintiffs failed to plead parallel conduct in part because the alleged parallel conduct "lack[ed] temporal proximity").

Plaintiffs do allege certain price movements or stable prices for specific

Defendants, but they do not allege facts suggesting that those changes were made in concert or derived from collusive information sharing. Parallel conduct can be adequately pled through factual allegations showing generally similar pricing trends. *See In re Baby Food Antitrust Litig.*, 166 F.3d 112, 132 (3d Cir. 1999). Here, more detail would be needed about similar pricing trends during the Class period for Defendants Michigan Sugar Company, Louis Dreyfus, and U.S. Sugar Savannah to provide a factual basis for parallel conduct sufficient to imply concerted action.

### a.    Group Pleading

Plaintiffs frequently rely on group pleading, referring to "the Producer Defendants" collectively when alleging communications and price coordination. (MCC ¶ 68 ("[T]he Producer Defendants regularly shared contemporaneous competitively sensitive, non-public information about their pricing and sold positions with Commodity, and Commodity in turn contemporaneously shared that competitively sensitive information with the other Producer Defendants."); ¶ 75 ("The Producer Defendants learned of each other's current pricing, crop size, crop yields, future beliefs on pricing, and sold positions only because Commodity collected this competitively sensitive information from each of them and shared it with the other[.]"); ¶ 83 ("[S]enior executives at Producer Defendants explicitly sought to signal pricing intentions to their competitors."); ¶ 85 ("The Producer Defendants knowingly and intentionally sought, shared, received, and used non-public, competitively sensitive information from Mr. Wistisen of Commodity pursuant to their anticompetitive agreement . . . in order to raise, fix, maintain, or stabilize Granulated Sugar prices."); ¶ 130 ("[T]he Producer

Defendants developed and agreed to standardized pricing formulas.").

Group pleading may be permitted when the underlying allegations plausibly show that all defendants participated in same conduct, but it is not appropriate when the complaint fails to tie each defendant to the alleged act. *See In re Milk Prods. Antitrust Litig.*, 84 F. Supp. 2d 1016, 1020 (D. Minn. 1997) (dismissing case where allegations lumped defendants together), *aff'd*, 195 F.3d 430 (8th Cir. 1999). Conclusory statements that lump defendants together, without factual support for each, are insufficient. *See In re Pork Antitrust Litig.*, Civ. No. 18-1776 (JRT/LIB), 2019 WL 3752497, at *8–9 (D. Minn. Aug. 8, 2019) (dismissing claims against some defendants because there were "no specific allegations in the complaints that plausibly establish those defendants engaged in parallel conduct").

Here, the alleged conspiracy centers chiefly on Wistisen's role—as an intermediary or broker—through which competitors allegedly shared sensitive pricing information to fix prices. Another possible broker is referenced in addition. To state a plausible claim against each Producer Defendant, Plaintiffs must allege that *each* used Wistisen (or another common broker) for that purpose and engaged in the same parallel conduct. *See In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 803–04 (D. Minn. 2017); *McDonough v. Anoka Cnty.*, 799 F.3d 931, 946 (8th Cir. 2015) ("Each Defendant's alleged conduct must be assessed independently to ensure that [Plaintiffs] have pleaded sufficient facts regarding that Defendant[].").

The Complaint alleges no direct communication among any of the Producer Defendants, no promise required by Wistisen to exchange information, and no allegation

14

that any Defendant sought or received information in exchange for providing its own. Very few allegations connect any Producer Defendant other than United or ASR/Domino to the alleged scheme.

### b. Michigan Sugar

Plaintiffs allege that Wistisen told both United and ASR/Domino that he spoke with Michigan Sugar, and that Wistisen shared Michigan Sugar's spot price or estimated sold percentage information with United and/or Domino. (*See* MCC ¶¶ 93, 94, 106, 114.) Plaintiffs, however, do not allege that Michigan Sugar supplied Wistisen with non-public, forward-looking information or participated in a reciprocal exchange. At most, it can be inferred from these allegations that Michigan Sugar *possibly* provided the information to Wistisen, but not that it received confidential data in return or acted in concert with competitors. The few allegations referencing Michigan Sugar's pricing do not imply an intent to align its prices with other Producer Defendants. (*Id.* ¶¶ 91, 94, 114, 149, 153, 154); *see In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d at 1197 (finding plaintiffs failed to allege facts "connecting the purported price increase to an illegal agreement among competitors."). Even the reference to "Number 16" pricing formulas do not specifically connect to Michigan Sugar. Allegations that others possessed or repeated Michigan Sugar's prices, without more, do not plausibly allege agreement.

Plaintiffs rely on a table in their opposition brief to show parallel price increases by Michigan Sugar. (Doc. No. 408 at 10.) But the table does not identify when or how each producer's prices moved, and therefore does not "nudge" the parallel conduct claim from possibly to plausibly inferring an agreement. *See In re Pork Antitrust Litig.*, 2019

WL 3752497, at *8 ("Without specific information regarding each [d]efendant, the [c]ourt has no basis to analyze which, how many, or when any of the individual [d]efendants may have affirmatively acted to reduce the supply of pork. And that type of information is vital to pleading parallel conduct."). For example, when Michigan Sugar raised prices in May and June 2021, the table shows that United held firm. (Doc. No. 392 at 4.) The same table includes only one of Imperial's price points, and none for Louis Dreyfus or U.S. Sugar Savannah. (*Id.*)

Defendants note that Plaintiffs' charts rely on retail or price-index data, which they argue the Producer Defendants do not control, rather than each producer's free on board ("FOB") pricing. FOB prices reflect the cost of the goods at the seller's loading point, excluding shipping or delivery costs. Plaintiffs' charts do not plausibly infer that the producers' prices moved in coordination.

### c.    Louis Dreyfus, Imperial, U.S. Sugar Savannah

Plaintiffs' allegations about Louis Dreyfus, Imperial, and U.S. Sugar Savannah suffer from the same defects: they lack facts showing reciprocal exchanges of pricing information or coordinated price movements. Louis Dreyfus owned Imperial's assets from 2014 to 2022, after which time U.S. Sugar Savannah acquired them. There are no allegations that anyone at any of these three companies provided or received competitively sensitive pricing information from another Producer Defendant or Wistisen during the Class period. Nor are there allegations that any acted on competitor information. Only a handful of paragraphs even mention Imperial.

The first such allegation states that broker Gerald Kramer provided Domino's

pricing information to Imperial once in 2019. (MCC ¶ 89.) Plaintiffs allege that the conspiracy extended "beyond" Wistisen and Commodity and included Kramer. (*Id.* ¶¶ 81, 89.) But this does not imply that Imperial or Louis Dreyfus (or U.S. Sugar Savannah years later) used Kramer as a conduit to exchange confidential information or that any of them assented to fix prices. It only shows that Imperial may have received information. The Complaint does not allege that Imperial reciprocated, agreed, or acted upon what it learned, or that other producers used Kramer to trade information. This isolated incident does not make it plausible that Imperial joined a price-fixing agreement.

Section 1 of the Sherman Act requires concerted action—a meeting of the minds. Receiving information is not the same as agreeing to fix prices. Knowledge of competitors' pricing does not plausibly infer an agreement. Without allegations of reciprocal exchanges, aligned timing, or coordinated price movements, paragraph 89 cannot plausibly sustain the claim that Imperial participated in an alleged cartel.

The *United States Sugar Corp.* decision provides useful context. That court described Imperial as a "price-uncompetitive" firm, noting that it lacked the capacity to compete aggressively on price. *United States Sugar Corp.*, 73 F.4th at 202. While those background facts are not binding here, they inform a common-sense evaluation of whether Imperial was a plausible participant in the alleged conspiracy, given the absence of any specific allegations of information sharing or parallel pricing.

The other allegations relating to Imperial do not change that conclusion. Plaintiffs allege that Imperial relied on "publicly observed benchmarks," declined to be a "price-taker," and considered competitive reactions. (MCC ¶¶ 130, 133, 164.) They also allege

that after speaking to Imperial's CEO, a Domino executive predicted that United/U.S. Sugar would likely follow Imperial's pricing approach after the acquisition. (*Id.* ¶ 165.) Those statements, read in context, describe unilateral business judgment, not collusion. None allows a reasonable inference that Imperial or Louis Dreyfus agreed to exchange confidential pricing information or engaged in parallel conduct with the other producers. *See Reg'l Multiple Listing Serv. of Minn., Inc. v. Am. Home Realty Network, Inc.*, 9 F. Supp. 3d 1032, 1044–45 (D. Minn. 2014) (stating that a claim against a corporate parent requires that it "took specific action, separate and apart from [its subsidiary's] actions, that generally furthered the alleged anti-competitive conspiracy"). In fact, there are no allegations of Imperial's price movements at all.

The allegations attempting to sweep U.S. Sugar Savannah into the conspiracy are even thinner. The last alleged communication between any Producer Defendant and any broker occurred in July 2021, before U.S. Sugar Savannah acquired Imperial's assets in 2022. No allegation even implies that U.S. Sugar Savannah communicated with any broker or competitor thereafter. Plaintiffs merely assert that "through its acquisition of Imperial," U.S. Sugar Savannah "joined and committed acts in furtherance of the conspiracy." (Doc. No. 406 at 6.) Absent are allegations describing what action, if any, U.S. Sugar Savannah took to further the alleged scheme. It is true that "[p]articipation by each conspirator in every detail in the execution of the conspiracy is unnecessary to establish liability" because each conspirator "may be performing different tasks to bring about the desired result." *Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*, 620 F.2d 1360, 1367 (9th Cir. 1980). But Plaintiffs allege no conduct at all by U.S. Sugar Savannah after

the acquisition.

For these reasons, Plaintiffs have not plausibly alleged parallel conduct involving Louis Dreyfus, U.S. Sugar Savannah, or Imperial. The conspiracy-based claims against those Defendants are dismissed without prejudice.

### d.    United and ASR/Domino

Whether Plaintiffs' allegations plausibly support a claim that United and ASR/Domino agreed to participate in an anti-competitive conspiracy with the Commodity Defendants, as shown through their alleged parallel conduct, is a close question. Plaintiffs allege that there were sugar pricing communications between Wistisen and Eric Speece of United and between Wistisen and Alan Henderson of Domino. (MCC ¶¶ 87–117.) Plaintiffs allege that "United did intentionally and regularly share its sold position with Mr. Wistisen, who United knew would in turn share it with ASR/Domino and other competitors," and that "ASR/Domino employees shared non-public, confidential, commercially sensitive pricing, sold position, and other information with Mr. Wistisen knowing that he would provide the information to other competitors." (*Id.* ¶¶ 78, 80.)

Disseminating price information "is not itself a per se violation of the Sherman Act." *United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 113 (1975); *see also Jien v. Perdue Farms, Inc.*, Civ. No. 1:19-CV-2521-SAG, 2020 WL 5544183, at *8 (D. Md. Sept. 16, 2020) (observing that collecting competitor data and sharing one's own is "neither illegal nor inherently collusive," particularly absent facts showing coordinated pricing). To state a claim, the Complaint must allege that the information exchange was

19

part of an agreement to fix prices, supported by plausible allegations of parallel conduct.

Simply alleging that firms acted alike or similarly is not enough. *See Jien*, 2020 WL 5544183, at *8. As stated above, the Complaint does not explain how each of the Defendants' prices changed over time and moved in relation to one another. Several allegations are conclusory. For example, Plaintiffs' allegation that "many of the price increases" occurred after the annual International Sweetener Colloquium, but the cited paragraphs show only that ASR/Domino raised prices. (*See* MCC ¶¶ 142, 146, 157.) Likewise, Plaintiffs allege that "Defendants held similar prices 'firm' in parallel," citing that United was "firm at $36.50 (no change) and now $38.50 on cane" on September 21, 2020. (*Id.* ¶ 150.) But no facts alleged indicate that ASR/Domino—or any other Defendant—held a similar price at that time. Such conclusory group allegations are insufficient. *See In re Pork Antitrust Litig.*, 2019 WL 3752497, at *8–9 (finding no parallel conduct supported when the allegations did not include "which, how many, or when any of the individual Defendants may have affirmatively acted").

Industry-wide data does not cure the deficiency. *See id.* at *8 (stating that "industry-wide data" did "nothing to indicate how any of the individual Defendants acted" and did "not suffice to plausibly plead parallel conduct"); *see also In re Cattle Antitrust Litig.*, Civ. No. 19-1222, Civ. No. 19-1129 (JRT/HB), 2020 WL 5884676, at *6 (D. Minn. Sept. 29, 2020) (stating industry-wide data was not sufficient to infer that defendants acted similarly).

Still, Plaintiffs do allege some facts connecting United and ASR/Domino through Wistisen. They claim that both discussed pricing based on "Number 16" spot prices and

used a common formula to set their prices. (*See* MCC ¶ 132 (stating that United "mirrored" ASR's Gulf FOB price of $40.50).) While Number 16 prices are public benchmarks (*id.* ¶ 131), Plaintiffs allege that Alan Henderson, an ASR/Domino employee, referenced United's "impending $2 price increase for beet sugar" and remarked that "it makes sense if they follow the #16 market and do the math." (*Id.* ¶ 132.) Taken together, these facts plausibly suggest that United and ASR/Domino shared competitively sensitive information, used a common pricing formula, and raised prices in tandem.

Plaintiffs' attempt to implicate all the Producer Defendants with using a formula based on Number 16 pricing—through group pleading—is not supported by the facts as pled. Nothing in the Complaint plausibly alleges that all producers priced off the same benchmark, agreed to do so, or acted within comparable timeframes. Only United and ASR/Domino appear in paragraphs 131–32 of the MCC. Knowing that Imperial also used a benchmark before its 2021 acquisition does not plausibly connect Imperial—or any other producer—to a coordinated scheme. (*See id.* ¶ 133.)

Plaintiffs also allege that in May 2021, Wistisen told ASR/Domino—based on a conversation with United—to "expect big action over the next month" and "expect to raise prices, and not by just a dollar." (*Id.* ¶ 153.) ASR/Domino allegedly raised prices in August and October 2021. (*Id.* ¶¶ 154–56.) Missing are allegations of United's actual pricing during those months. However, the reasonable inference is that United similarly

increased prices during that time.[1] Though not direct admissions, these allegations add the factual content needed to move the claim from conceivable to plausible as to United and ASR/Domino.

### e.    Other Forces Weighing on Plausibility

Assessing plausibility under *Twombly* entails weighing common economic experience and obvious alternative explanations for the observed price increases. *Twombly*, 550 U.S. at 557, 565, 567. If a "complaint alleges facts that are merely consistent with liability . . . , the existence of obvious alternative explanations simply illustrates the unreasonableness of the inference sought and the implausibility of the claims made." *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 505 (6th Cir. 2013).

The structure of the granulated sugar industry—with many distributors and other competitive forces—could independently explain the observed price movements. *See United States Sugar Corp.*, 73 F.4th at 201–02. Even so, Plaintiffs allege that the Producer Defendants together control more than 70 percent of the market for granulated sugar. (MCC ¶ 141.) They further allege that sugar prices during the Class Period rose faster than inflation, despite increased supply. (*Id.* ¶¶ 137–39.) These allegations, if true, could support an inference in Plaintiffs' favor.

Defendants note that other macroeconomic forces could also have influenced

---

[1]    Plaintiffs also allege that Michigan Sugar increased its prices in June and August 2021 (*id.* ¶¶ 153–54), however, there are no facts alleged indicating that Michigan Sugar was told the same information about United that ASR/Domino was told in May 2021.

sugar prices during the Class Period. Independent distributors—responsible for about one quarter of refined sugar sales nationwide—compete on price and terms separately from the producers, potentially affecting market prices through independent conduct. *See United States Sugar Corp.*, 73 F.4th at 202. Plaintiffs' pleadings do not address how competition among distributors might have constrained or disrupted any producer-level coordinated pricing. That gap highlights why specific, defendant-level allegations of parallel conduct are essential: they allow a court to assess plausibility even in the face of alternative economic explanations. *See In re Cattle Antitrust Litig.*, 2020 WL 5884676, at *6 (finding only "a sheer possibility that a defendant has acted unlawfully" where alternative explanations and the absence of individualized allegations remained) (quoting *Iqbal*, 556 U.S. at 687).

Without facts showing how prices moved during the relevant period for Michigan Sugar, Louis Dreyfus, Imperial, and U.S. Sugar Savannah, and how those movements relate to information exchanges, parallel conduct is not plausibly alleged for these Defendants. Accordingly, the motions to dismiss Count I are granted as to Michigan Sugar, Louis Dreyfus, Imperial, and U.S. Sugar Savannah, and the Sherman Act price-fixing claim is dismissed without prejudice as to those Defendants. *See Park Irmat Drug Corp.*, 911 F.3d at 516–17 (dismissing § 1 claim for failure to plead "parallel conduct"); *see also Twombly*, 550 U.S. at 556 (concluding plaintiff had not pled "enough factual matter (taken as true) to suggest that an agreement was made").

### f.    Plus Factors

Because parallel conduct is sufficiently pled as to United and ASR/Domino, the

next question is therefore whether Plaintiffs have pled at least one "plus factor"—a circumstance suggesting concerted action. *See, e.g.*, *Blomkest Fertilizer, Inc. v. Potash Corp. of Sask.*, 203 F.3d 1028, 1033 (8th Cir. 2000). Common plus factors include a motive to conspire, action against self-interest, market concentration, and substantial inter-firm communication accompanying the parallel conduct. *See, e.g.*, *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d at 1194–95.

Plaintiffs allege some forward-looking exchanges through Wistisen, together with the Number 16 pricing formula, though these communications appear limited as pled. And Defendants' prior regulatory scrutiny that Plaintiffs cite is also dated. Nonetheless, Plaintiffs do plausibly allege several classic plus factors.

They claim that the granulated sugar market is highly concentrated—Producer Defendants control 70 to 75 percent of U.S. sales, and before U.S. Sugar's 2022 acquisition of Imperial, the top three marketers accounted for 65 percent. (MCC ¶¶ 58, 169, 170.) They also allege high barriers to entry and inelastic demand—both recognized plus factors. (*Id.* ¶¶ 173–75, 184.) And they allege opportunities to coordinate or collude through industry meetings and trade associations boards. (*Id.* ¶¶ 178–82.)

While these factors are not overly compelling, even one suffices to nudge from possible to plausible an inference of agreement between United and ASR/Domino. Plaintiffs' allegations therefore state a viable § 1 claim for price fixing as to those two Defendants. The motions to dismiss Count I are denied as to United and ASR/Domino.

### B.    Information Exchange Claim

Plaintiffs separately allege in Count II that Defendants engaged in an unlawful

exchange of competitively sensitive information.

To survive dismissal, Plaintiffs must plausibly allege (1) an agreement to exchange information and (2) anticompetitive effects flowing from that agreement. *See Dickson v. Microsoft Corp.*, 309 F.3d 193, 206 (4th Cir. 2002); *In re Pork Antitrust Litig.*, 781 F. Supp. 3d 758, 867 (D. Minn. 2025) (citing *United States v. Container Corp. of Am.*, 393 U.S. 333, 334 (1969)) ("A standalone information exchange can violate § 1 if it tends to produce anticompetitive effects.").

Information exchanges are not *per se* unlawful. *See United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978) ("The exchange of price data . . . does not invariably have anticompetitive effects; indeed, such practices may increase efficiency and enhance competition."). To prevail, Plaintiffs must show that the concerted action unreasonably restrained trade. *See In re Pork Antitrust Litig.*, 781 F. Supp. 3d at 867.

Whether an exchange restrains trade is analyzed under the rule of reason. *Gypsum*, 438 U.S. at 441 n.16. That framework requires examination of "the relevant business, its condition before and after the restraint, and the restraint's history, nature, and effect." *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997). Showing anticompetitive effect generally requires proof of market power—"the ability to raise prices above those that would prevail in a competitive market." *NCAA v. Bd. of Regents*, 468 U.S. 85, 109 n.38 (1984); *Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 951 (9th Cir. 1998).

### 1. Agreement Element – Michigan Sugar, Louis Dreyfus, Imperial, U.S. Sugar Savannah

Plaintiffs have not plausibly alleged an agreement to exchange information by

Michigan Sugar, Louis Dreyfus, Imperial, or U.S. Sugar Savannah. Count II relies on the same alleged agreements as Count I. (*See* MCC ¶¶ 232, 239.) That conflation is problematic: Count I requires an agreement to fix prices; Count II requires only an agreement to exchange information.

Even setting that aside, Plaintiffs still have not pled concerted action among those four Defendants. An agreement—tacit or express—is required under § 1 even when the restraint is evaluated under the rule of reason. *See Olean Wholesale Grocery Coop., Inc. v. Agri Stats, Inc.*, No. 19-C-8318, 2020 WL 6134982, at 5 (N.D. Ill. Oct. 19, 2020); *In re Pork Antitrust Litig.*, 781 F. Supp. 3d at 867.

Plaintiffs argue that the exchange itself proves agreement. (Doc. No. 403 at 44.) But the Complaint lacks facts showing an *exchange*. For example, paragraph 89 alleges only that Imperial received pricing information from broker Kramer about Domino. That does not plausibly imply that Imperial exchanged—or agreed to exchange—confidential data. No mutual participation is alleged.[2]

Likewise, no facts indicate that U.S. Sugar Savannah or Michigan Sugar exchanged information at all. The Complaint does not allege that they communicated with Wistisen. The claim that Michigan Sugar's prices were shared by others does not imply Michigan Sugar's agreement to share information. Absent allegations of reciprocal exchange, the element of agreement is missing. *See In re Citric Acid Litig.*, 191 F.3d

---

[2]    Upon further review of the allegations concerning Imperial under the information exchange claim, the ruling has been revised from what was stated at the hearing. This written order controls.

1090, 1103 (9th Cir. 1999) ("Mere possession of a competitor's pricing information is not evidence of an agreement to exchange it.").

Accordingly, Plaintiffs have not adequately pled the requisite agreement for Count II as to Michigan Sugar, Louis Dreyfus, Imperial, or U.S. Sugar Savannah.

### 2.    Agreement Element – United and ASR/Domino

Plaintiffs, however, plausibly allege an agreement between United and ASR/Domino. They claim that both exchanged information through Wistisen about a common pricing formula based on Number 16 spot prices; that in May 2021 United shared with Wistisen its plan for a "big move"; and that ASR/Domino subsequently raised prices. These facts plausibly support concerted action for Count II.

The United States, in its Statement of Interest, cautions against heightening the pleading bar for § 1 information exchange claims simply because the exchange occurs through an intermediary. This Order does not do so. The same pleading standard applies whether competitors communicate directly or through a conduit.

The United States also notes that concerted action can be shown by an invitation to participate in collective conduct followed by acceptance of that invitation. *See Interstate Cir., Inc. v. United States*, 306 U.S. 208, 227 (1939). That theory, however, is not alleged here. Nothing in the Complaint suggests that Wistisen—or anyone else—invited the Producer Defendants to a reciprocal exchange or that they were aware of such an invitation. The "invitation and acceptance" framework therefore does not apply.

### 3.    Anticompetitive Effects

The remaining question is whether Plaintiffs plausibly allege anticompetitive

effects under the rule of reason. They do.

Plaintiffs allege a concentrated market, and that the information exchange produced higher prices than would have prevailed in a competitive market. (MCC ¶ 84.) They claim retail prices rose 69 percent between January 2019 and October 2024 and diverged from historic trends unexplained by inflation, cost increases, or production changes. (*Id.* ¶¶ 136–38.) They also allege resulting harm to competition. (*Id.* ¶ 222.) Taken together, these facts plausibly describe anticompetitive effects.

In sum, because the allegations do not plausibly support an inference that there was an agreement to exchange competitively sensitive information—tacit or express—with Michigan Sugar, Louis Dreyfus, U.S. Savannah Sugar, or Imperial, Count II is dismissed without prejudice as to those Defendants.

As to United and ASR/Domino, Plaintiffs have adequately pled both concerted action and anticompetitive effect. The motions to dismiss Count II are therefore denied as to United and ASR/Domino.

### C.    Injury

To state a claim under § 1 of the Sherman Act, Plaintiffs must plead not only an agreement to restrain trade, but also an antitrust injury. That requires allegations that each named Plaintiff purchased the product at supracompetitive prices caused by the conspiracy and that the injury is of the type the antitrust laws are intended to prevent. *See Insulate SB*, 797 F.3d at 542 ("[A] private plaintiff must demonstrate that he has suffered an antitrust injury because of the alleged conduct of the defendants.").

Plaintiffs allege that the Direct Purchaser Plaintiffs bought refined sugar "directly

from one or more of the Producer Defendants" at artificially inflated prices, and that the

Indirect Purchaser Plaintiffs purchased sugar products through the chain of distribution

and likewise paid supracompetitive prices. (MCC ¶¶ 14–16, 221–22.) Defendants argue

that Plaintiffs' allegations of injury are too thin. Plaintiffs respond that further detail is not

required at this early stage.

The pleading standard for injury is not demanding. Alleging that Plaintiffs paid

supracompetitive prices generally suffices to establish standing and injury at the motion

to dismiss stage. *See In re Cattle Antitrust Litig.*, 2021 WL 7757881, at *11 (finding an

injury appropriately alleged by asserting that "horizontal price fixing restrained or

eliminated beef price competition and deprived everyone down the supply chain in the

relevant market of the benefit of price competition"). Defendants will have the

opportunity through discovery and summary judgment to test whether market conditions

or supply-side factors—such as those discussed in the *United States Sugar Corp.*

decision—explain the observed price increases. At this stage, Plaintiffs have sufficiently

alleged an injury: purchasing refined sugar at prices allegedly inflated by horizontal price

fixing. *See Blue Shield of Va. v. McCready*, 457 U.S. 465, 482 (1982) (stating that "an

increase in price resulting from a dampening of competitive market forces is assuredly

one type of injury").

Plaintiffs' claim for prospective relief, however, is not sufficiently pled. To seek

injunctive relief under § 16 of the Clayton Act, 15 U.S.C. § 26, a plaintiff must show a

concrete and particularized threat of injury that is actual and imminent, fairly traceable to

the challenged conduct, and likely to be redressed by a favorable decision. *Summers v.*

*Earth Island Inst.*, 555 U.S. 488, 493 (2009). Past harm, without a real and immediate threat of future violation, is insufficient. *In re Pre-Filled Propane Tank Antitrust Litig.*, 893 F.3d 1047, 1054 (8th Cir. 2018).

Plaintiffs allege no facts suggesting a continuing threat of injury. There are no allegations of communications with Wistisen—or any broker—after July 2021. (MCC ¶ 36 (stating that Commodity appears "defunct"); ¶ 89 (referencing broker Gerald Kramer's isolated sharing of price quotes in 2019).) Absent facts showing post-2021 coordination or ongoing exchanges of sensitive pricing information, Plaintiffs have not plausibly shown a real and immediate threat of future harm. Plaintiffs' request for injunctive relief under Section 16 is therefore dismissed without prejudice. *See In re Pre-Filled Propane Tank Antitrust Litig.*, 893 F.3d at 1057 (rejecting request for injunctive relief because plaintiffs had not plausibly alleged ongoing conspiracy).

## III.    Indirect Purchaser Plaintiffs' State Law Claims: Antitrust, Consumer Protection, and Unjust Enrichment

Having addressed the federal Sherman Act claims, the analysis turns to the state law causes of action asserted by the Indirect Purchaser Plaintiffs ("IPPs"). The Commercial Indirect Purchaser Plaintiffs ("CIPPs") and the Consumer Indirect Purchaser Plaintiffs ("Consumers") bring parallel state law claims under three categories: (1) violations of state antitrust statutes in jurisdictions that allow indirect purchaser suits ("repealer states"); (2) violations of state consumer protection statutes, often referred to as "Little FTC Acts"; and (3) unjust enrichment (restitution) theories. (*See* MCC ¶ 236 n.23; Doc. Nos. 342, 343.)

Because these claims arise under the laws of more than forty jurisdictions, they will be addressed category by category rather than jurisdiction by jurisdiction. *See In re Cattle Antitrust Litig.*, 2021 WL 7757881, at *10–16; *In re Generic Pharmaceuticals Pricing Antitrust Litig.*, 368 F. Supp. 3d 814, 832–51 (E.D. Pa. 2019). This approach promotes consistency and efficiency.

### A.    Antitrust Statutes

Defendants move to dismiss the IPPs' state antitrust claims, arguing lack of standing, absence of intrastate effect, and failure to allege a violation distinct from the federal § 1 claim. (Doc. No. 398 at 38–41.) Plaintiffs respond that their nationwide collusion and overcharge allegations plausibly plead violations of state repealer statutes. (Doc. No. 403 at 55–57.) Defendants' reply narrows certain arguments, and Plaintiffs have withdrawn the Alabama claim. (Doc. No. 424 at 36.)

Standing exists only for named Plaintiffs who purchased sugar or reside in the state whose law is invoked. *See In re Pork Antitrust Litig.*, 495 F. Supp. 3d at 773. The Short-Form Complaints identify such purchases for each asserted jurisdiction. (*See* Doc. Nos. 342, 343.) That suffices at the pleading stage.

Defendants further argue that several state antitrust statutes apply only to conspiracies conducted wholly within a single state. But courts addressing similar statutes in the *Broiler Chicken* and *Cattle* cases have held that allegations of a nationwide price-fixing scheme that raised prices paid by purchasers within the state are sufficient at the pleading stage. *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d at 809; *In re Cattle Antitrust Litig.*, 2021 WL 7757881, at *10. That reasoning is adopted here. The state

antitrust claims are adequately pled in all repealer jurisdictions except Alabama, which is dismissed without prejudice as withdrawn.

### B.    Consumer Protection Statutes

Defendants also seek dismissal of the consumer protection claims, arguing that many of the statutes require deception rather than anticompetitive conduct, exclude indirect purchasers, or require in-state conduct. (Doc. No. 398 at 41–43.) Plaintiffs respond that these statutes broadly prohibit unfair or unconscionable methods of competition and therefore reach the alleged collusion. (Doc. No. 403 at 58–63.) Plaintiffs also withdraw the Vermont claim and note that Minnesota's 2023 amendment to its Consumer Fraud Act added unfair "methods of competition." (*Id.* at 61–63.)

Courts addressing comparable claims recognize two functional categories. Statutes in jurisdictions such as Arkansas, California, the District of Columbia, Florida, Hawaii, Illinois, Massachusetts, Minnesota (as amended in 2023), New Mexico, North Carolina, Rhode Island, Utah, and Wisconsin prohibit unfair or unconscionable methods of competition and encompass price-fixing conduct. *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d at 810–11; *In re Pork Antitrust Litig.*, 495 F. Supp. 3d at 775. Those claims survive.

By contrast, statutes such as New York Gen. Bus. Law § 349, Oregon's Unlawful Trade Practices Act, and Vermont's consumer statute require deception or misrepresentation. *In re Cattle Antitrust Litig.*, 2021 WL 7757881, at 13–14. Because the MCC alleges collusion rather than deception, those claims fall outside the statutory scope and are dismissed without prejudice. Defendants' additional contention that some of these

statutes require in-state conduct is premature. At the Rule 12 stage, this Court accepts as true the allegations that purchasers in those states paid supracompetitive prices there. Whether later evidence shows the challenged conduct occurred sufficiently "within the state" for statutory purposes is fact intensive and better addressed on a developed factual record at summary judgment or class certification. *See In re Pork Antitrust Litig.*, 495 F. Supp. 3d at 776.

### C.    Unjust Enrichment and Restitution

Defendants argue that the unjust enrichment claims fail because they duplicate statutory remedies, omit state-specific elements, or are barred in non-repealer states. Courts addressing these same issues—including in *Broiler Chicken*, *Generic Pharmaceuticals*, and *Pork*—have permitted unjust enrichment claims to proceed in the alternative to statutory antitrust claims, including for indirect purchasers. *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d at 818; *In re Generic Pharmaceuticals Pricing Antitrust Litig.*, 368 F. Supp. 3d at 837; *In re Pork Antitrust Litig.*, 495 F. Supp. 3d at 776–77; *see also In re Cattle Antitrust Litig.*, 2021 WL 7757881, at *15 (stating that when it remains uncertain whether plaintiffs' other legal remedies will prevail, unjust enrichment claims pled in the alternative should not be dismissed). This Court is persuaded by that reasoning and outcomes.

Unjust enrichment claims seek disgorgement of unlawful gains and are not categorically limited by a state's repealer status. Defendants' preemption and duplication arguments are premature. Whether equitable restitution will ultimately be barred by an adequate legal remedy or duplicate recovery depends on which statutory claims survive

and on facts developed through discovery. At this stage, Rule 8 permits pleading in the alternative. The IPPs allege that Defendants collected supracompetitive prices traceable to an unlawful combination and that equity requires restitution. That theory may also proceed in the alternative. Consistent with how Plaintiffs pled their claims, only Ohio and Indiana are excluded; those two unjust enrichment claims are dismissed without prejudice. All remaining unjust enrichment claims stand.

### D.    Standing and Intrastate Effect

Defendants renew their argument that some IPPs fail to plead an intrastate nexus under certain state laws. This Court has already determined that the named Plaintiffs have Article III and statutory standing in each state where they reside or purchased sugar. The question here is narrower: whether the Complaints plausibly allege in-state effects where the statute requires it.

Consistent with *Broiler Chicken* and *Cattle*, allegations that purchasers in those states paid supracompetitive prices for sugar bought and consumed there satisfy the pleading standard. *See In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d at 809; *In re Cattle Antitrust Litig.*, 2021 WL 7757881, at *10–11. To the extent later factual development reveals state-specific limitations—such as proof of in-state commerce, scienter, or extraterritorial reach—those issues can be addressed at class certification or summary judgment.

In sum, the motions to dismiss are denied as to the state antitrust claims in all repealer jurisdictions except Alabama, which Plaintiffs withdrew. They are denied as to the "Little FTC Act" consumer protection statutes and granted as to the deception-based

statutes, including those of New York and Oregon, and Vermont, which was withdrawn. The motions are denied on the unjust enrichment claims except in Ohio and Indiana, where such claims are barred. Standing and intrastate-effect challenges are rejected at this stage.

## IV.    Leave to Amend

Leave to amend should be freely given "where justice so requires." Fed. R. Civ. P. 15(a)(2). Plaintiffs are granted leave to amend their Complaints within 30 days to address the dismissed claims (if they so choose) and to address the deficiencies with respect to their claim for prospective injunctive relief. Plaintiffs are granted an additional 15 pages for any amendments. If any claim, including any state law claim, is being abandoned, it should be removed from the amended pleadings.

## ORDER

Based on the foregoing, and on all the files, records, and proceedings in this case,

**IT IS HEREBY ORDERED** that:

1.      Defendants' Joint Motion to Dismiss (Doc. No. 396) is **GRANTED IN PART** and **DENIED IN PART**;

2.      Defendant Louis Dreyfus's Motion to Dismiss (Doc. No. 379) is **GRANTED**;

3.      Defendant U.S. Sugar Savannah's Motion to Dismiss (Doc. No. 385) is **GRANTED**;

4.      Defendant Michigan Sugar's Motion to Dismiss (Doc. No. 390) is **GRANTED**; and

5.      The Sherman Act Claims alleged in the Master Consolidated Complaint and three Short-Form Complaints (Doc. Nos. 332, 341, 342, 343) against Michigan Sugar, Louis Dreyfus, Imperial, and U.S. Sugar Savannah are dismissed without prejudice to refiling. Plaintiff's request for injunctive relief is dismissed without prejudice. The motions to dismiss the state law claims are granted in part and denied in part as explained above.

6.      Plaintiffs shall have **30 days** from the date of this Order to file an Amended Master Consolidated Complaint and Amended Short Form Complaints, and they are granted an additional 15 pages for any amendments.

7.      Defendants' deadline to answer or otherwise respond to Plaintiffs' Amended Master Consolidated Complaint and Amended Short-Form Complaints is December 12, 2025. If a Motion to Dismiss the Amended Complaints is filed, Opposition briefs are due January 9, 2026. Reply briefs are due January 30, 2026. Surreplies are not permitted without leave of Court.

Date: October 15, 2025                          *s/ Jerry W. Blackwell*
                                                 JERRY W. BLACKWELL
                                                 United States District Judge